IN THE UNITED STATES DISTRICT COURT
<u>FOR THE DISTRICT OF MARYLAND</u>
*Southern Division*

|  |  |  |
|---|---|---|
| | * | |
| **IRENE MOSS THOMPSON,** | * | |
| **ADMINISTRATOR OF THE ESTATE** | | |
| **OF ROBERT WHITE, II,** *et al.*, | * | |
| | * | |
| *Plaintiffs,* | * | |
| | | **Case No.: 20-cv-1272-PWG** |
| **v.** | * | |
| | * | |
| **ANAND BADGUJAR,** *et al.*, | * | |
| | * | |
| *Defendants.* | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \*

<u>**MEMORANDUM OPINION**</u>

This is a police shooting case in which the underlying events were largely captured on a police body-worn camera. The facts are profoundly disturbing and are all too common in the news these days: a police officer fatally shot an unarmed African American man, made all the more tragic by the allegations in the complaint that the decedent, Mr. Robert Lawrence White II, suffered from multiple mental illnesses.

The shooting occurred at approximately 2:00 p.m. on June 11, 2018 in Silver Spring, Maryland, when Montgomery County Police Officer Anand Badgujar shot and killed the 41-year-old Mr. White. Complaint ("Compl.") ¶¶ 1, 7, 9, ECF No. 1. Plaintiffs[1] filed this lawsuit on May 5, 2020 alleging the following causes of action: Unreasonable Deprivation of Liberty and Life in

---

[1]     The Plaintiffs in this matter are Irene Moss Thompson, as the administrator of Mr. White's estate (Estate No. W96134), Compl. ¶ 1, and Irene Moss Thompson and Roddy Moss Thompson, Mr. White's sister and brother, Compl. ¶ 2.

violation of the Fourth Amendment, via 42 U.S.C. § 1983 (Count 1); Excessive Force in violation

of the Fourth Amendment, via 42 U.S.C. § 1983 (Count 2); Violation of Title II of the Americans

with Disabilities Act of 1990 (Count 3); Violation of the Rehabilitation Act of 1973 (Count 4);

Unlawful Detention and Violations of Articles 24 and 26 of the Maryland Declaration of Rights

(Count 5); Municipal Liability (Respondeat Superior) (Count 6); a Survival Claim (Count 7); and

Wrongful Death (Count 8).  Counts 1, 2, and 5, are alleged only against Officer Badgujar.  Counts

3, 4, and 6 are alleged only against Montgomery County.  Counts 7 and 8 are alleged against both

defendants.

Defendants jointly have filed a Motion to Dismiss, ECF No. 12, and the issues are fully

briefed.[2]  Accordingly, I find that a hearing is not necessary.  Loc. R. 105.6 (D. Md. 2021).  For

the reasons that follow, the motion is GRANTED.  However, the parties will be directed to submit

further briefing on whether Plaintiffs must be afforded an opportunity to amend their complaint.

**<u>Background</u>**

a)  The Complaint

The following facts are taken from the Complaint, and, for purposes of resolving a motion

to dismiss, must be accepted as true (if well pleaded), except to the extent that they are contradicted

by a document or other exhibit that is referenced as integral to the allegations.[3]  In addition to the

facts stated in the complaint, there is a video of the encounter between Mr. White and Officer

Badgujar on YouTube,[4] which is incorporated into the complaint.  What the video shows is

---

[2]      ECF Nos. 12, 13, 14.

[3]      *Fayetteville Inv'rs v. Commercial Builders, Inc.*, 936 F.2d 1462, 1465 (4th Cir. 1991) ("[I]n
the event of conflict between the bare allegations of the complaint and any exhibit attached . . .
the exhibit prevails.").

[4]      https://www.youtube.com/watch?v=3R40nzHb6mA.  The video is not submitted as an
exhibit; rather, a citation to the URL is provided in the complaint.  When citing to the footage, I

essential to a proper analysis of the issues raised by the Motion to Dismiss, and this is addressed in a separate section below.

As stated, the incident giving rise to this case occurred on June 11, 2018 in Silver Spring, Maryland.   The complaint alleges that Mr. White suffered from mental illness, including a cognitive impairment dating to at least 1993 when he was sixteen years old; "his parents and teachers reported that [he] was subject to memory loss and possibly depressed."  Compl. ¶ 8.  An evaluation found him to suffer from attention deficit hyperactivity disorder ("ADHD") and learning disabilities, and concluded that he likely lacked the skills to function adequately in the community.  *Id*.  At age 20, he tested at a 7th grade level for reading, a 5th grade level in spelling, and a 3rd grade level in math.  *Id*.

When Officer Badgujar encountered Mr. White, the Plaintiffs allege, Mr. White was walking at a normal pace without anyone else in his immediate proximity, and he posed no threat to anyone.  *Id*. ¶ 9.  Nor had Officer Badgujar received any complaints, 911 or otherwise, about Mr. White.  *Id*. ¶ 10.  The complaint alleges that when Officer Badgujar was still in his cruiser and first observed Mr. White, Mr. White had his hands in his pockets and looked at the police car.  *Id*. ¶ 11.  Mr. White did not respond to Officer Badgujar calling out to him; he continued to walk away from the car.  *Id*.  The complaint alleges that in response, Officer Badgujar exited his cruiser and pointed his gun toward Mr. White.  *Id.*

The complaint further alleges that Officer Badgujar never radioed to dispatch that he observed criminal or suspicious behavior before he began to pursue Mr. White.  *Id*. ¶ 12.  Nor did Officer Badgujar tell Mr. White that he was under arrest.  *Id*.  The pursuit lasted at least three

---

will refer to BWC (Body Worn Camera) at [timestamp].  Because the video is uploaded on YouTube and is not a permanent record, the parties have been directed to file with the Court an electronic copy of the footage on a CD or other permanent format.

minutes, during which time Officer Badgujar maintained close proximity to Mr. White, which the complaint alleges is contrary to accepted practice when an officer has drawn his or her firearm. *Id*. ¶ 15.   During the pursuit, the complaint alleges that Mr. White exhibited signs of mental impairment, which Plaintiffs assert would be recognizable to a reasonably trained officer.   *Id*.   In response to these signs, Officer Badgujar clearly radioed to dispatch that Mr. White might be attempting "suicide by cop."   *Id*. ¶ 17; BWC 00:55.   But the complaint (contradicting the video) alleges that Mr. White *did not* exhibit signs of "suicide by cop" because he did not initiate the encounter and sought only to avoid the officer.   *Id*. ¶ 19.   The plaintiffs allege in the complaint that Mr. White walked away from Officer Badgujar and shouted at the officer to stop following him. *Id*. ¶ 20.   At no point during the encounter did Officer Badgujar call for the Montgomery County Crisis Intervention Team ("CIT").   *Id*. ¶ 22.   Nor did the County, through its dispatcher, deploy the CIT despite indicia of mental illness when informed that Officer Badgujar encountered a possible case of "suicide by cop."   *Id.* ¶ 24.

Moments before the shooting, a second officer arrived on the scene.   *Id*. ¶ 26.   The complaint alleges that Officer Badgujar continued to point his firearm at Mr. White and to pursue him; at no point did Officer Badgujar attempt de-escalation measures.   *Id*. ¶ 27.   As Mr. White approached Officer Badgujar one final time, with his hands visible and empty, Officer Badgujar fired at least ten rounds at Mr. White, killing him.   *Id*. ¶ 28.   During the entire interaction, Officer Badgujar was acting within the scope of his employment and under color of law while wearing a full Montgomery County Police uniform.   *Id*. ¶¶ 10, 29.   The facts of this encounter, Plaintiffs allege, show that Montgomery County knew or should have known that its officers routinely violate civil rights of the mentally ill by refusing to provide necessary public service and accommodations.   *Id*. ¶ 30.

4

b)  The Body-Worn Camera Footage

The Body-Worn Camera footage depicts details of the incident different from, and in addition to, those described in the complaint.  And, in important respects, it contradicts allegations in the complaint, as well as the characterization of the events by Plaintiffs in their opposition to the motion to dismiss, most notably Plaintiffs' contention that at no point during the encounter did Mr. White provoke the officer or pose a risk of serious injury to anyone. Significantly, at multiple points in the video, Mr. White charged at Officer Badgujar and either punched or attempted to punch him.  As will be discussed further, when, as here, a document or video is referenced as integral to the complaint, disputes between the allegations of the complaint and what is plain from the video are resolved in favor of the video.  *See Fayetteville Inv'rs v. Commercial Builders, Inc.*, 936 F.2d 1462, 1465 (4th Cir. 1991).

It is unclear whether the moment the video starts is when Officer Badgujar first observed Mr. White, or whether the encounter started earlier.  As Plaintiffs argue in their opposition memorandum, the video begins when Officer Badgujar is some distance away from his Police Cruiser, which means the encounter likely started earlier than what is depicted in the video. Plaintiff's Opposition Memorandum ("Pls.' Opp.") 3, ECF No. 13.  The complaint and the video are consistent in that Officer Badgujar pointed his firearm at Mr. White approximately fifteen seconds into the recording.  But the video and the complaint differ in their account of what occurred shortly after that point in time.  At 00:38, the video shows Mr. White swing a fist or open hand at the officer.  BWC, 00:38–00:40.  Nowhere in the complaint is this fact acknowledged.

For the next two minutes and twenty seconds, the complaint and video largely comport with one another.  But with respect to the seconds leading up to the shooting—which are critical to the Fourth Amendment claim, *infra* at 15—the video flatly contradicts the facts pleaded in the

complaint.  The video, starting at approximately 02:50, shows Officer Badgujar and Mr. White walking (and, almost immediately, Officer Badgujar running) toward the unlocked Police Cruiser; at 02:58, Officer Badgujar opens the door and apparently turns off the engine or retrieves something from the center console.  As he exits the car, Officer Badgujar turns to his right and Mr. White is visible in the frame.  Mr. White glances behind him over his left shoulder, where the second officer to arrive is seen approaching on foot.  BWC 03:01.  A second later, Mr. White takes an athletic or fighting stance—knees bent and weight shifted forward—and begins charging toward Officer Badgujar, his hands chest-high and elbows bent, yelling "Do it!" repeatedly.  BWC 03:02–03:05.  In contrast, the complaint alleges that at this moment, "Mr. White approached the officer again, hands up, open and clearly empty.  Officer Badgujar then resorted to multiple firearm shots – no fewer than ten (10) shots – even when Mr. White was laying flat and motionless on the pavement."  Compl. ¶ 28.

But the video tells a much different story.  As Mr. White is moving toward Officer Badgujar, Officer Badgujar backs away from Mr. White, but Mr. White closes the space between them and reaches out to either grab or hit Officer Badgujar.  BWC 03:05.  A second later, Officer Badgujar fires the first shot.  *Id*. 03:06.  Both men fall to the ground.  *Id*. 03:07.  Mr. White then gets back on his feet and yells "Do it again!" as he makes another lunge toward Officer Badgujar, who is still lying on the ground.  *Id*. 03:08.  Before he can stand up, Officer Badgujar again fires his weapon, at least eight times.  *Id*. 03:09–03:13.  Mr. White then lay motionless on the concrete. *Id.* 03:14.

## **Standard of Review**

Federal Rule of Civil Procedure 12(b)(6) provides for "the dismissal of a complaint if it fails to state a claim upon which relief can be granted."  *Velencia v. Drezhlo*, Civil Action No.

RDB-12-237, 2012 WL 6562764, at \*4 (D. Md. Dec. 13, 2012). This rule's purpose "'is to test the sufficiency of a complaint and not to resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses.'" *Id.* (quoting *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006)). To that end, the Court bears in mind the requirements of Rule 8, *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) when considering a motion to dismiss pursuant to Rule 12(b)(6). Specifically, a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), and must state "a plausible claim for relief," as "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice," *Iqbal*, 556 U.S. at 678–79. *See Velencia*, 2012 WL 6562764, at \*4 (discussing standard from *Iqbal* and *Twombly*). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 663.

When reviewing a motion to dismiss, "[t]he court may consider documents attached to the complaint, as well as documents attached to the motion to dismiss, if they are integral to the complaint and their authenticity is not disputed." *Sposato v. First Mariner Bank*, No. CCB–12–1569, 2013 WL 1308582, at \*2 (D. Md. Mar. 28, 2013); *see also CACI Int'l v. St. Paul Fire & Marine Ins. Co.*, 566 F.3d 150, 154 (4th Cir. 2009). Here, the video depicting the shooting is explicitly incorporated into the complaint and is indisputably integral to the claims. Compl. ¶ 31. Importantly, as already noted, "[w]hen the plaintiff attaches or incorporates a document upon which his claim is based, or when the complaint otherwise shows that the plaintiff has adopted the contents of the document, crediting the document over conflicting allegations in the complaint is

proper." *Goines v. Valley Cmty. Servs. Bd.,* 822 F.3d 159, 167 (4th Cir. 2016).[5]  Additionally,

well-pleaded facts in the complaint are accepted as true, s*ee Aziz v. Alcolac*, 658 F.3d 388, 390

(4th Cir. 2011), and factual allegations must be construed in the light most favorable to plaintiffs.

*Adcock v. Freightliner LLC*, 550 F.3d 369, 374 (4th Cir. 2008).

## Discussion

*Count 1: § 1983 Claim for Unreasonable Deprivation of Life and Liberty Under the Fourth Amendment[6]*

"Section 1983 provides a remedy against any person who, acting under color of law,

deprives another of constitutional rights." *Bixler v. Harris*, No. WDQ-12-1650, 2013 WL

2422892, at *5 (D. Md. June 3, 2013) (citing 42 U.S.C. § 1983).  42 U.S.C. § 1983 states:

> Every person who, under color of any statute, ordinance, regulation, custom or
> usage of any State or Territory or the District of Columbia, subjects or causes to be
> subjected, any citizen of the United States or other person within the jurisdiction
> thereof to the deprivation of any rights, privileges or immunities secured by the
> Constitution and laws, shall be liable to the party injured in an action at law, suit in
> equity, or other proper proceeding for redress.

As courts have ceaselessly observed, § 1983 is not itself the source of substantive rights;

rather, it "provides 'a method for vindicating federal rights elsewhere conferred.'"  *Albright v.*

*Oliver*, 510 U.S. 266, 271 (1994) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n. 3 (1979)).

Here, an essential element of the Plaintiffs' § 1983 claim in Count 1 alleging wrongful detention

and harassment is whether Officer Badgujar deprived Mr. White of a constitutional right.  *See*

*Mathis v. McDonough*, Civ. A. No. ELH-13-2597, 2014 WL 3894133, at *16 (Aug. 7, 2014).  That

---

[5]     There is little doubt that, as used in the cited cases, the word "document" encompasses
electronically stored information, such as the BWC.  *See, e.g*., Fed. R. Civ. P. 34(a)(1)(A).

[6]     The discussion that follows does not address the Defendants' various defenses of qualified
immunity, governmental immunity, or public official immunity.  I decline to reach those defenses
because I find that the complaint fails to state a claim, making it unnecessary to address the various
immunity defenses.

right, the Plaintiffs allege, was Mr. White's Fourth Amendment right to be free of unreasonable deprivations of liberty and life.  Compl. 8 (Count 1).  To give rise to a violation of the Fourth Amendment, there must be a seizure.  *United States v. Cloud*, 994 F.3d 233, 242 (4th Cir. 2021) ("That officers employed a show of authority does not alone implicate the Fourth Amendment. . . . For a seizure to occur, the [individual] must actually submit to that show of authority.") (citing *United States v. Stover*, 808 F.3d 991, 995 (4th Cir. 2015)); *see also California v. Hodari D.*, 499 U.S. 621, 629 (1991) ("[A]ssuming that [Officer] Pertoso's pursuit in the present case constituted a 'show of authority' enjoining Hodari to halt, since Hodari did not comply with that injunction he was not seized until he was tackled.").

Here, Defendants concede that a seizure occurred when Office Badgujar shot Mr. White. Defs.' Mot. 18, ECF No. 12.  However, whether a seizure occurred prior to that point is hotly contested by the parties.  Determining whether a seizure occurs under the Fourth Amendment requires assessing the totality of the circumstances.  Defendants argue that, because Mr. White was on the move and at no point submitted to Officer Badgujar's show of authority, he never was seized prior to the shooting, and therefore, the Fourth Amendment is not implicated in this case before that occurred.  Defs.' Mot. 17.  Plaintiffs see things differently, arguing that Officer Badgujar's initial show of authority by drawing his firearm amounted to a seizure, Pls.' Opp. 6 (citing *Terry v. Ohio*, 392 U.S. 1, 19 n. 16 (1968)), sufficient to implicate the Fourth Amendment.  Further, Plaintiffs argue, restraining the freedom of a person to walk away is a seizure.  *Id.* (citing *Tennessee v. Garner*, 471 U.S. 1, 7 (1985)).  And Plaintiffs cite to a Maryland Court of Appeals decision noting that an officer's intention has "controlling importance" where there is no manual seizure.

*Id.* at 7 (citing *Bouldin v. State*, 350 A.2d 130, 133 (Md. 1967)[7]).  Plaintiffs argue that because Officer Badgujar ran toward Mr. White and pointed his gun at him while demanding that he stop, BWC at 00:12, his intent could not be more clear, and at that point in time, Mr. White was seized "at the minimum from that instant."  Pls.' Opp. 7.

A review of Fourth Amendment precedent, however, makes clear that Mr. White was not seized for purposes of a Fourth Amendment violation until Officer Badgujar shot Mr. White.  That Officer Badgujar employed a show of authority does not alone give rise to Fourth Amendment protections.  The Fourth Circuit has recently reiterated well-established Supreme Court precedent on this issue, noting that *United States v. Mendenhall*, 446 U.S. 544, 554 (1980) held that an officer's show of authority occurs when an individual would not feel free to leave, with the individual's view measured objectively from an innocent person's perspective.  *United States v. Cloud*, 994 F.3d 233, 242 (4th Cir. 2021).  But there is more to the inquiry than just whether an officer displayed a show of authority, which the Fourth Circuit stated is necessary, although not alone sufficient, to implicate the Fourth Amendment.  *Id*.  Seizure requires submission "to that show of authority."  *Id*. (citing *United States v. Stover*, 808 F.3d 991, 995 (2015) citing, in turn, *California v. Hodari D.*, 499 U.S. 621, 628–29 (1991)).  And, critically, "without actual submission to the police, there is at most an attempted seizure, which is not subject to Fourth Amendment protection."  *Id*. (citations and internal quotations omitted).[8]

---

[7]    *Bouldin* concerned the arrest of an unconscious individual and provides an early account of what is necessary for an arrest.  The Maryland Court of Appeals instructed that for cases "(w)here there is no touching, the intention of the arrestor and the understanding of the arrestee are determinative, for in order for there to be an arrest in such case, there must always be an intent on the part of one to arrest the other and an intent on the part of such other to submit."  *Bouldin*, 350 A.2d at 133.

[8]    In *Hodari D.*, upon which Defendants place great weight, Justice Scalia, writing for the Court, also observed that a show of force was a necessary but not sufficient precondition to seizure through a show of authority.  *Hodari D.*, 499 U.S. at 628.  The opinion goes on to discuss the

Under this framework, the complaint fails to allege a critical component of its Fourth Amendment causes of action prior to the shooting—that Mr. White submitted to Officer Badgujar. The complaint and video show just the opposite. The confrontation started with Mr. White walking away from Officer Badgujar, Compl. ¶ 11, then turned to a pursuit, Compl. ¶ 16, and continued to involve Mr. White walking away from Officer Badgujar, Compl. ¶¶ 20, 25. The moment of seizure, in Plaintiffs' view, was when Officer Badgujar pointed his firearm at Mr. White, depicted in the video for the first time at the 00:15 second mark. Pls.' Opp. 7. But contemporaneous with that action, Mr. White is moving toward Officer Badgujar, then appears to chase him, and, at BWC 00:39–00:40, strikes or pushes the officer with his hand. In no way can this be construed as submission to the officer's authority. Therefore, under the binding precedents cited above, I must find that the Fourth Amendment is not implicated at the time Plaintiffs allege the violation started, and that the Plaintiffs have failed to state a cause of action in Count 1 for an illegal Fourth Amendment seizure prior to the time of the shooting.

There can be no question, however, that when Officer Badgujar shot Mr. White, he effectively forced Mr. White's submission. It is these few seconds of the encounter, which I analyze below, that merit further discussion in connection with the Fourth Amendment. To the extent the complaint alleges that the shooting constitutes a violation of the Fourth Amendment in Count 1, this claim is dismissed under the reasonableness analysis set forth below.

---

Court's earlier decision in *Brower v. Inyo County*, 489 U.S. 593, 596 (1989) where a 20-mile-long police vehicle chase ended with the decedent's fatal crash into a police roadblock. There, no seizure occurred because the decedent at no point stopped or yielded to the show of authority. *Hodari D.*, 499 U.S. at 628 (citing *Brower*, 489 U.S. at 597). So too here. As the video all too graphically demonstrates, at no point did Mr. White yield to the ongoing show of authority by Officer Badgujar.

*Count 2*: *§ 1983 Claim for Excessive Force in Violation of the Fourth Amendment*

Plaintiffs' second Fourth Amendment claim differs from the first in that they allege Officer Badgujar used excessive force against Mr. White during the encounter—namely, that objectively viewed, the circumstances cannot justify drawing a firearm and repeatedly pointing it at Mr. White at close range, and then shooting him ten times.  Compl. ¶ 37.  Again, a seizure is a prerequisite to an excessive force claim.  *Graham v. Connor*, 490 U.S. 386, 395 (1989) ("Today we make explicit what was implicit in *Garner*'s analysis, and hold that *all* claims that law enforcement officers have used excessive force . . . in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard.").  In concluding this discussion, the Court noted in footnote 10 that a seizure triggering Fourth Amendment protections requires physical force or show of authority that in some way restrains an individual's liberty.  *Id.* (citing *Terry v. Ohio*, 392 U.S. 1, 19 n. 16 (1968)).

Here, while Plaintiffs argue the seizure occurred from the outset of Officer Badgujar confronting Mr. White, Pls.' Opp. 13, I have found that argument to be legally unfounded.  Therefore, the Fourth Amendment is not implicated until Officer Badgujar shot Mr. White, at which point, it is beyond dispute that Mr. White yielded to Officer Badgujar's use of force.  *Graham*, 490 U.S. at 395; *see also Dobbs v. Townsend*, 416 F. Supp. 3d 441, 446–48 (D. Md. 2019) (applying Fourth Amendment excessive force framework to a § 1983 claim where plaintiff did not comply with orders from officers and was then shot by nonlethal munitions).  Because an actual submission is required for a seizure to occur, *Hodari D.*, 499 U.S. at 628–29; *Cloud*, 994 F.3d at 242; the Fourth Amendment is not implicated in this case until the moment Officer Badgujar fired his weapon.

Notably, "*Graham v. Connor* clearly establishes the general proposition that use of force is contrary to the Fourth Amendment if it is excessive under objective standards of reasonableness." *Saucier v. Katz*, 533 U.S. 194, 201–02 (2001), *receded from on other grounds by Pearson v. Callahan*, 555 U.S. 223 (2009).  When, as here, the Plaintiffs "alleg[e] that a police officer has unconstitutionally used deadly force, the officer's actions are judged on a standard of objective reasonableness." *Sigman v. Town of Chapel Hill*, 161 F.3d 782, 786 (4th Cir. 1998) (citing *Graham*, 490 U.S. at 396–97 (1989)).  Courts consider what a "reasonable officer on the scene" would have done, taking into account such factors as "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 787. This evaluation is guided by pragmatic consideration of the circumstances faced by the officer at the moment that the allegedly excessive force occurred, not judged by what can be hypothesized in hindsight with the benefit of unlimited time for reflection.   The Fourth Circuit explained:

> [T]he "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. . . . The calculus of reasonableness must embody allowances for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.

*Id.* (quoting *Graham*, 490 U.S. at 396–97); *see also Moore v. Peitzmeier*, No. TDC-18-2151, 2020 WL 94467, at *6 (D. Md. Jan. 7, 2020) (citing *Garner*, 471 U.S. at 8).  Relevantly, the Fourth Circuit "has consistently held that an officer does not have to wait until a gun is pointed at the officer before the officer is entitled to take action." *Anderson v. Russell*, 247 F.3d 125, 131 (4th Cir. 2001).  Indeed, "a police officer need not, in all circumstances, 'actually detect the presence of an object in a suspect's hands before firing on him.'" *Sigman*, 161 F.3d at 788 (quoting *McLenagan v. Karnes*, 27 F.3d 1002, 1007 (4th Cir. 1994)).  In *Sigman*, the Fourth Circuit held:

> Where an officer is faced with a split-second decision in the context of a volatile atmosphere about how to restrain a suspect who is dangerous, who has been recently—and potentially still is—armed, and who is coming towards the officer despite officers' commands to halt, we conclude that the officer's decision to fire is not unreasonable.

*Id.*

Defendants cite multiple cases to argue that the excessive force claim here must fail.  In *Holloman v. Rawlings-Blake*, Judge Blake of this Court granted the defendants' summary judgment motion as to a *pro se* plaintiff's series of § 1983 and other claims against elected officials and Baltimore City Police Officers after officers shot and killed her son.  Civ. No. CCB-14-1516, 2015 WL 4496413 (D. Md. July 22, 2015).  Judge Blake found that the officers' use of deadly force was reasonable because, at the time force was deployed, "a reasonable officer in either officer's shoes would have found sufficient justification to use such force because . . . the officers had probable cause to believe that Johnson posed a threat of serious physical harm."  *Id.* at *3.  The decedent, Mr. Johnson, pinned one officer to the floor and was "thrashing and unpredictable," despite not visibly possessing weapons.  *Id.* at *4.  Additionally, two officers were present and had been attempting to restrain Mr. Johnson at the time of the shooting.  *Id.* at *2.  Defendants also cite *Hall v. Burney*, where the court found that an officer had probable cause to believe that the plaintiff (who pushed the officer in the chest, struck the officer with a stick, threatened to retrieve a firearm, and punched the officer repeatedly) posed a serious risk of harm.  *Hall v. Burney*, No. 10-cv-184-BO, 2013 WL 4828570, at *2–3 (E.D.N.C. Sept. 10, 2013).  As a result, the court deemed the officer's non-fatal and purportedly accidental shooting of the plaintiff to be justified.  *Id.* at *3.

On the facts alleged before me, both in the complaint and in the video of the incident, Plaintiffs cannot maintain a claim for excessive force because the facts do not give rise to an inference that the shooting was unreasonable.  Viewed through the lens of the *Garner* factors—

the severity of the crime, the threat to the officer, and whether the suspect resisted—the claim must fail. While the complaint alleges that Officer Badgujar was not present to investigate any allegation against Mr. White, Mr. White proceeded to commit, at the very least, attempted second degree assault against a police officer when he swung his arm at Officer Badgujar, BWC 00:38, and again when he assumed a fighting stance and repeatedly lunged at the officer, BWC 03:05–03:08. Md. Code. Ann. Criminal Law § 3-203. These facts show that the threat to Officer Badgujar was clear, with Mr. White behaving erratically and repeatedly resisting Officer Badgujar.

Plaintiffs argue that the force here was excessive because, in their view, Mr. White neither posed a threat nor did he possess a weapon. Pls.' Opp. 14. But Plaintiffs agree that courts assess the force at issue at the moment the force is used, *id.* at 12–13 (citing *Henry v. Purnell*, 652 F.3d 524, 531 (4th Cir. 2011)) and in that moment here, the video referenced in the complaint clearly shows Mr. White taking a fighting stance and charging at Officer Badgujar, who then falls or is knocked to the ground as a result of Mr. White rushing towards him. As noted above, where there is a conflict between a complaint and an exhibit, the exhibit controls. *Fayetteville Inv'rs*, 936 F.2d at 1465; *see Azimirad v. HSBC Mortg. Corp.*, No. DKC-10-2853, 2011 WL 1375970, at *2–3 (D. Md. Apr. 12, 2011). Despite conceding that force is assessed at the moment it is deployed, Plaintiffs nonetheless argue that Mr. White "did not threaten the officer with a weapon, . . . had his hands open and in the air, and that the officer showed he did not fear for his life" because he pursued Mr. White for several minutes. Pls.' Opp. 14. This may be so, but it is tangential to the excessive force inquiry, which must "focus on the moment that the force is employed." *Purnell*, 652 F.3d at 531 (citation omitted). And at the moment that Officer Badgujar shot Mr. White, Mr. White repeatedly shouted "Do it!" as he aggressively charged toward Officer Badgujar while swinging his hands at the officer. BWC 03:01–03:09. Both men fell to the ground after Officer

Badgujar fired the first shot; Mr. White then stood up, lunged at the officer, and shouted "Do it again!" Officer Badgujar, still on the ground, then fired his weapon several more times at Mr. White.  BWC 03:09–03:13.

The facts surrounding the decision to use force here do not give rise to an inference of unreasonableness.  While the cases applying the *Garner* factors largely appear in the summary judgment context, rather than on a motion to dismiss, they are nonetheless persuasive in determining what a plaintiff's pleading and, in this case, the video it incorporated by reference, must show in order to state a plausible claim of excessive force.  Plaintiffs have not cited any cases addressing what is necessary to survive a motion to dismiss. One case the Court found, *Koontz v. Kimberley*, No. 19-cv-1231-JMC, 2019 WL 4447254, (D. Md. Sept. 17, 2019), *denied* the motion to dismiss, observing that balancing the *Graham* factors was more appropriate for the jury to consider.  *Id*. at *8.  But in *Koontz*, the plaintiff was tased while *physically restrained* by three deputies while resisting requests to present his hand for handcuffing.  *Id*. at *2–3.  Some time later, he was tased again while restrained to a hospital bed.  *Id.* at *3.  The plaintiff's conduct there was non-threatening and gave rise to an inference of unreasonableness; here, Mr. White took a fighting stance and charged at Officer Badgujar, whose weapon was drawn and could have been grabbed and used against Officer Badgujar.  Considering Mr. White's erratic and threatening conduct in the seconds before the shooting, the facts do not give rise to an inference of unreasonableness. Rather, the facts mirror those of *Holloman*, where Judge Blake held that the officer's use of force was reasonable, explaining that a reasonable officer had probable cause to believe the decedent posed a threat of serious harm.  2015 WL 4496413, at *3.  The decedent in *Holloman* was thrashing and unpredictable, having pinned one officer to the floor, *id.*; here, Mr. White behaved similarly when he attacked Officer Badgujar and could have grabbed his gun.

16

Further, the fact that Mr. White was unarmed is not dispositive, *Holloman,* 2015 WL 4496413 at *4, particularly considering Mr. White's aggressive and erratic behavior. As the Fourth Circuit has instructed, "the question is whether a reasonable officer in the same circumstance would have concluded that a threat existed justifying the particular use of force." *Waterman v. Batton*, 393 F.3d 471, 476 (4th Cir. 2007) (citing *Graham*, 490 U.S. at 396–97). Even though he was unarmed, Mr. White clearly attacked Officer Badgujar and could have grabbed the officer's firearm. Without a doubt, a reasonable officer under these circumstances would have concluded a threat existed that justified deadly force.

What happened here was a tragic breakdown of a police-citizen interaction. But that alone is not enough for a Fourth Amendment violation. Nothing in the complaint or the video supports an inference of unreasonableness, and therefore the claim must fail.

> *Counts 3 and 4: Violation of Title II of the Americans with Disabilities Act, 42 U.S.C. § 12131* et seq. *and the Rehabilitation Act of 1973, 29 U.S.C. § 701* et seq.

Montgomery County asserts that the complaint fails to state against it a claim under the Americans with Disabilities Act (ADA), as well as the Rehabilitation Act.[9]  Defs.' Mot. 6. The ADA was enacted in 1990 "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities," 42 U.S.C. § 12101(b)(1), and

---

[9]      The parties agree that the ADA and the Rehabilitation Act claims are substantially the same and maybe assessed together. Def.'s Mot. 6 n.2 (citing *Seremeth v. Bd. of Cnty. Comm'rs of Frederick*, 673 F.3d 333, 336, n. 1 (4th Cir. 2012) ("Claims under the ADA's Title II and the Rehabilitation Act can be combined for analytical purposes because the analysis is '"substantially the same."'") (citing *Doe v. Univ. of Md. Med. Sys. Corp.*, 50 F.3d 1265 n.9 (4th Cir. 1995)); Pls.' Opp. 17 (citing the same).

Additionally, while the motion and, consequently, the discussion below, discuss only Officer Badgujar's conduct in the context of the ADA and Rehabilitation Act claims, those claims are pleaded only against Montgomery County, Compl. 10–11, apparently on the theory that the County can be liable for its agent's action. *See* Pls.' Opp. 10 (citing *Paulone v. City of Fredrick*, 787 F. Supp. 2d 360, 372 (D. Md. 2010)).

"to provide clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities," *id.* § 12101(b)(2). Title II of the ADA prohibits public entities, including "any State or local government" and "any department, agency, special purpose district, or other instrumentality of a State or States or local government," *id.* § 12131(1), from discriminating "by reason of" disability against a "qualified individual with a disability," *id.* § 12132.

For purposes of Title II, a "qualified individual with a disability" is defined as an individual with a disability "who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." *Id.* § 12131(2). Several circuits "have determined that § 12132's words 'or be subjected to discrimination by that entity' are meant to be a 'catch-all phrase that prohibits all discrimination by a public entity, regardless of the context'"—in other words, that Title II of the ADA applies to "anything a public entity does." *Seremeth*, 673 F.3d at 338 (citing cases) (citations omitted); *see also Paulone,* 787 F. Supp. 2d at 380–81 (collecting authority).

To state a claim under Title VII of the ADA, Plaintiffs here are required to allege that (1) Mr. White was a qualified individual with a disability; (2) Mr. White was either excluded from participation in or denied the benefits of a public entity's services, programs, or activities, or was otherwise discriminated against by the public entity, and that (3) the exclusion, denial of benefits, or discrimination occurred due to Mr. White's disability. *Poole v. Gaston Cnty.*, Civ. A. No. 3:15-cv-309-DCK, 2017 WL 4479219, at *8 (W.D.N.C. Oct. 6, 2017) (citing *Gohier v. Enright*, 186 F.3d 1216, 1220 (10th Cir. 1999)). Further, when it comes to holding public entities liable under

18

the ADA, a plaintiff must establish knowledge on that entity's part, meaning the entity is aware of a "known physical or mental limitation," evincing a clear need for accommodation. *Smith v. City of Greensboro*, No. 1:19-CV-386, 2020 WL 1452114, at *13 (M.D.N.C. Mar. 25, 2020) (citing 42 U.S.C. § 12112(b)(5)(A); *Robertson v. Las Animas Cnty. Sheriff's Dep't*, 500 F.3d 1185, 1196–97 (10th Cir. 2007)); *see also Seremeth*, 673 F.3d at 336 ("Discrimination includes not making reasonable accommodations to the *known* physical or mental limitations of an otherwise qualified individual with a disability.") (emphasis added, citations and internal quotation marks omitted).

As to the ADA claim, which the parties agree is assessed under the same standard as the Rehabilitation Act claim, the Defendants argue that Plaintiffs have failed to plead that Mr. White was a qualified individual with a disability, contending that the complaint merely invoked Mr. White's ADHD and little beyond that. Defs.' Mot. 8. But I need not address whether or not Mr. White was a qualified individual because whether these claims survive hinges on the knowledge element. Plaintiffs assert two theories of liability under the ADA and Rehabilitation Act: wrongful arrest and failure to reasonably accommodate. Pls.' Opp. 21–30. I have already found that Mr. White was not seized for purposes of the Fourth Amendment up until the moment he was shot. Accordingly, the wrongful arrest theory must fail because at no point was Mr. White placed under arrest. Therefore, I will assess below whether the Plaintiffs have adequately pleaded that the County possessed the requisite knowledge to be liable on a failure to accommodate theory.

Defendants argue that the complaint assumes without having pleaded that the County knew or had reason to know that Mr. White suffered from mental impairments and is devoid of any plausible allegation Officer Badgujar or the County knew there was a need for any accommodation. Defs.' Mot. 9–10. Defendants elaborate that determining whether an individual has a mental or physical limitation requires time for consideration and is a decision that cannot be

19

made in a rapidly evolving situation such as the interaction and altercation between Mr. White and Officer Badgujar.  *Id*. at 9 (citing *Wis. Cmty. Servs. v. City of Milwaukee*, 465 F.3d 737, 749 (7th Cir. 2006)).  Further, Defendants argue that the complaint here implausibly presumes the County and Officer Badgujar had knowledge of Mr. White's disability on the basis of Officer Badgujar radioing to dispatch that Mr. White might have been attempting "suicide by cop."  *Id*. at 10.

Conversely, Plaintiffs argue that Officer Badgujar and the County should have known Mr. White was mentally ill due to Officer Badgujar perceiving Mr. White as suicidal, thus requiring an accommodation.  What is not required, Plaintiffs argue, is knowledge of the specific nature of the mental impairment. Pls.' Opp. 27 (citing *Smith v. City of Greensboro*, No. 1:19-CV-386, 2020 WL 1452114, at *13 (M.D.N.C. Mar. 25, 2020)).  Rather, as Plaintiffs see it, any lay person ought to have considered "suicide an abnormal mental state," thus meeting the knowledge requirement. *Id*.  And due to that knowledge, the County should have summoned the readily available Crisis Intervention Team to accommodate Mr. White's distressed mental state.  *Id*. at 28.

The Defendants' citation to the *Wisconsin Community Services* case, as Plaintiffs note, is unpersuasive.  While the Seventh Circuit there did require fact-specific and careful balancing to assess the needs of both parties to determine whether an accommodation was necessary, that inquiry arose in the entirely unrelated context of a municipal building permit decision regarding a mental health clinic.  *Wis. Cmty. Servs.* 465 F.3d at 752.  It cannot be said to require, as Defendants argue, the passing of some requisite time period within which to make a determination about the need for an accommodation under ADA, Def.'s Mot. 9.  Further, Plaintiffs correctly note that *Wisconsin Community Services* concerned *future* accommodations in the zoning context and that the possible accommodations there were unreasonable. Pls.' Opp. 27–28.  Here, the need for a possible accommodation was far more immediate.  *Id*. at 28.

20

But as to whether Defendants here had knowledge of Mr. White's mental illness, the Plaintiffs cite no authority in support of their allegation that the facts contained in the complaint and the body worn camera footage are sufficient to put the Defendants on notice of Mr. White's disabilities.  Judge Briggs' opinion in *Smith*[10] offers guidance on this issue, noting that the factual material contained in the complaint must allow an inference that accommodations were necessary due to an individual's disability.  *Smith*, 2020 WL 1452114, at *13.  There*,* the court observed it was at least plausible that the Officers (eight were on scene) recognized Mr. Smith suffered from a mental disability.  *Id*. at *13.  But what was far less clear was "whether the Officers should have perceived a need for special accommodation aside from the usual, lawful treatment afforded to any agitated, intoxicated, or distressed person."  *Id*.  Because the complaint did not plead that Mr. Smith requested an accommodation or that it should have been clear to officers that he required one, the court dismissed the ADA claim.  *Id*.; *see also Robertson v. Las Animas Cnty. Sheriff's Dep't*, 500 F.3d 1185, 1196 (10th Cir. 2007) ("[B]efore a public entity can be required under the ADA to provide an auxiliary aid necessary to afford an individual an equal opportunity to participate in the entity's services, programs, or activities, the entity must have knowledge that the individual is disabled, either because that disability is obvious or because the individual (or someone else) has informed the entity of the disability.")

The *Smith* case is persuasive authority that the ADA and Rehabilitation act claims here must fail.  The Plaintiffs have failed to plead facts that support a plausible inference that it should have been apparent to the officer or the County that an accommodation was possible or necessary.

---

[10]      The facts and claims in *Smith* mirror those here.  As summarized in the opinion, Mr. Smith, a mentally ill man, died after an encounter with eight Greensboro police officers; his parents later brought a lawsuit alleging violations of the Fourth and Fourteenth Amendments, Title II of the ADA, as well as state law claims.

The complaint alleges the existence of the Montgomery County Police Department's Crisis Intervention Team, based on a 2017 Facebook post from the department, but notes nothing more than that.  Compl. ¶ 22.  Where the complaint falls short is its failure to plead that the police dispatcher having received one radio transmission from Officer Badgujar that he may have encountered a case of "suicide by cop," BWC 00:55, plausibly triggered the need for the deployment of the CIT as a reasonable accommodation to address a disability under the ADA and Rehabilitation Act.  Just like in *Smith*, there is no allegation that Mr. White, or anyone on his behalf, requested an accommodation, which may have been sufficient to put the County on notice that he required an accommodation.  And while Mr. White may well have displayed an agitated mental state, it could just as plausibly have been attributed to being inebriated, high, or just furious over being approached and followed by Officer Badgujar.  The complaint alleges, in conclusory fashion, that the County had "ample time and opportunity to assess the situation and employ accommodations." *Id*. ¶ 46.  But these allegations are legal boilerplate at best, and do not support an inference that the County had the requisite knowledge that Mr. White suffered from a disability that required, as an accommodation, the deployment of the Crisis Intervention Team or that its failure to do so could amount to a violation of federal disability law.  Just like in *Smith*, the complaint fails to support a reasonable inference that the County should have perceived Mr. White had a disability necessitating an accommodation.  Thus Counts 3 and 4 must fail.

What is more, while the complaint points to a series of possible other accommodations, such as respecting Mr. White's "comfort zone" or allowing another officer who arrived moments before the shooting time to approach and assist, *id*. ¶ 23, the Fourth Circuit has instructed that consideration of exigencies inherent in police responses must be evaluated in determining the reasonableness of an accommodation. *Seremeth*, 673 F.3d at 339.  While there were no apparent

exigent circumstances that Mr. White posed an immediate threat to the general public—it is clear he did not threaten others—the video shows that from the beginning of Mr. White's encounter with Officer Badgujar, Mr. White certainly posed an unpredictable threat to the officer.  This is particularly so, considering Mr. White charged at Officer Badgujar after the officer's request that he stop, BWC 00:15–00:17, as well as his repeated physical altercations with the officer and unwillingness to follow commands.  The need to address these exigent circumstances left Officer Badgujar with no time to have gathered more information about Mr. White and relay it to dispatch, and, thus, the County lacked the requisite knowledge that an accommodation was necessary.  The allegations in the complaint, and the approximately three-minute video capturing the shooting, with no allegation from Plaintiffs that the County or Officer Badgujar had prior knowledge of Mr. White's mental impairment, are not enough to state an ADA or Rehabilitation Act claim here.

Finally, the complaint states (again, in conclusory fashion) that the County failed to train Officer Badgujar how to take a person such as Mr. White into custody.  Compl. ¶ 48(b).  But because there is no underlying ADA violation, the failure to train claim, to the extent one is asserted, must fail.  *Waller ex rel. Est. of Hunt v. Danville, VA*, 556 F.3d 171, 177 n.3 (4th Cir. 2009) ("While plaintiff attempts to pose training in dealing with those with mental health problems as an 'accommodation,' it is well-settled that the failure to train must have caused some violation of law for an action against a municipality to lie.") (citing *City of Canton v. Harris*, 489 U.S. 378, 388 (1989); *Bates v. Chesterfield Cnty.*, 216 F.3d 367, 373 n. 3 (4th Cir. 2011)).

### Count 5: Unlawful Detention and Violation of Article 24 and 26 of the Md. Declaration of Rights

Articles 24 and 26 of the Maryland Declaration of Rights are construed *in pari materia*, or in connection with, the Fourth Amendment.  *Henry v. Purnell*, 652 F.3d 524, 536 (4th Cir. 2011); *Littleton v. Swonger*, 502 F. App'x 271, 274 (4th Cir. 2012).  Because I have previously found that

no Fourth Amendment seizure occurred until the shooting, and that the shooting was objectively reasonable, the Article 24 and 26 claims alleged against Officer Badgujar also must fail.

Plaintiffs' attempt to get past the *in pari materia* hurdle by noting that Maryland constitutional provisions are not always interpreted in the same manner as their federal counterparts. Pls.' Opp. 31 (citing *Attorney General v. Waldron*, 426 A.2d 929 (Md. 1981)). That may be true, but Plaintiffs have provided no Maryland authority that would support a finding under Maryland constitutional law that a seizure occurred here prior to the shooting. While Plaintiffs do cite a series of cases, they are distinguishable, and unpersuasive. In *Bouldin*, the Maryland Court of Appeals held that the search incident to arrest exception did not apply in a factually dissimilar case in which officers searched a defendant's coat, recovering heroin, while the defendant was unconscious and before officers imposed the requisite restraint for an arrest. *Bouldin v. State*, 350 A.2d 130, 519–20 (Md. 1976). In *Bailey*, the Maryland Court of Appeals found that a seizure occurred when the officer grabbed a suspect's hands and placed them over his head, *Bailey v. State*, 987 A.2d 72, 82 (Md. 2010), a submission to authority not present here. And *Belote*, another Maryland Court of Appeals decision, concerned the extent to which a court may rely on an officer's subjective intent when assessing a search incident to arrest where the officer's objective conduct is unclear. *Belote v. State*, 981 A.2d 1247, 1254 (Md. 2009). These three cases do not meaningfully distinguish the well-established principle of Fourth Amendment law, examined above, that a suspect must submit to an officer's authority for a seizure to occur. Therefore, construing Articles 24 and 26 *in pari materia* to the Fourth Amendment, there was no seizure prior to the shooting, and the shooting was not objectively unreasonable. For these reasons, Count 5 must be dismissed.

*Count 6: Respondeat Superior*

Count Six alleges that Montgomery County is liable for damages under a theory of *respondeat superior* under Maryland law stemming from Officer Badgujar's violations of Mr. White's rights.  The Maryland Court of Appeals has held that, notwithstanding the inapplicability of respondeat superior liability in the § 1983 context, such a theory of liability is available for state constitutional violations.  *DiPino v. Davis*, 729 A.2d 354, 372 (Md. 1999) ("[L]ocal governmental entities do, indeed, have respondeat superior liability for civil damages resulting from State Constitutional violations committed by their agents and employees within the scope of the employment.").  But such a theory of liability rests upon a plaintiff sufficiently alleging a state constitutional violation, which I found Plaintiffs here have failed to do.  Accordingly, the *respondeat superior* claim fails.

### Count 7: Survival Action

A survival claim is derivative of the causes of action a decedent could have brought had the decedent survived; the decedent's estate may seek to recover in the decedent's name.  *See Smith v. Borello*, 804 A.2d 1151, 1154 (Md. 2002) (explaining that, in a survival action, the personal representative of the victim may sue to recover, for the estate of the victim, damages for the economic and non-economic losses suffered by the victim prior to his or her death—the damages that the victim would have been able to recover had he or she survived); *Anderson v. United States*, No. AW-09-2553, 2011 WL 1231143, at *3 (D. Md. Mar. 28, 2011) ("Damages recoverable in a Maryland survival action are limited to compensation for pain and suffering endured by the deceased, his lost time, and his funeral expenses." (citing *Stewart v. United Elec. Light & Power Co.*, 65 A. 49, 53 (Md. 1906))).  Here, Plaintiffs state that Mr. White, had he lived, could have brought causes of action against Officer Badgujar and the County based on illegal

25

seizure, discrimination, and failure to accommodate.  But because I have found the claims from which the survival action must derive are deficient, so too does the survival claim fail.

*Count 8:Wrongful Death*

To succeed on a wrongful death claim under Maryland law, a plaintiff who qualifies as a beneficiary under the wrongful death statute "must show by a preponderance of the evidence that the conduct of [the] defendant was negligent and that such negligence was a proximate cause of the death of the decedent."  *Weimer v. Hetrick*, 525 A.2d 643, 652 (Md. 1987); *United Elec. Light & Power Co.*, 60 A. at 248–49; *see also* Paul Sandler & James Archibald, Pleading Causes of Action in Maryland 521 (6th ed.) (listing four elements that a plaintiff must allege for a wrongful death claim: (1) the victim's death; (2) that the victim's death was proximately caused by the negligence of the defendant; (3) that the victim's death resulted in injury to the plaintiff, who falls within the category of beneficiaries defined by the statute; and (4) that the claim is brought within the applicable statutory period); Md. Code Ann., Cts. & Jud. Proc. § 3-904(a) (defining the class of beneficiaries who may recover for wrongful death).  The issue to be decided here is whether Plaintiffs have adequately pleaded that Officer Badgujar's conduct amounted to negligence sufficient to allege wrongful conduct.

The statute defines a wrongful act as one amounting to an "act, neglect, or default including a felonious act which would have entitled the party injured to maintain an action and recover damages if death had not ensued."  Md. Code Ann., Cts. & Jud. Proc. § 3-901(e).  The acts here that allegedly amount to a wrongful act are, according to the Plaintiffs, the officer's pursuit and provocation of Mr. White, excessive and unnecessary deadly force, disability-based discrimination against Mr. White, as well as the County's failure to reasonably accommodate Mr. White's

disability.  Pls.' Opp. 33.  Because I have found all these claims are legally deficient, the wrongful death action from which they derive cannot proceed, and Count 8 must be dismissed.

*Amendment*

I must now decide whether, at this juncture, dismissing the complaint in its entirety should be with or without prejudice.  When I held a pre-motion telephone conference with the parties, ECF No. 11, the Plaintiffs declined an opportunity to amend the complaint in light of Defendants' pre-motion letter, ECF No. 6, which clearly raised the deficiencies discussed above.  Plaintiffs' reasons for declining to do so are not readily apparent.  However, I recognize the Fourth Circuit's preference for adjudicating cases on the merits, *see Davis v. Williams*, 588 F.2d 69, 70 (4th Cir. 1978); *Gantt v. Sutton*, 225 F. App'x 197, 198 (4th Cir. 2007) (per curiam) (citing *Davis*), and longstanding willingness to allow parties to amend their pleadings.  *Coleman v. Peyton*, 340 F.2d 603, 604 (4th Cir. 1965) (per curiam); *Alley v. Yadkin Cnty. Sheriff Dep't*, 698 F. App'x 141, 142 (4th Cir. 2017) ("[W]here a claim is potentially cognizable, the plaintiff should be afforded an opportunity to amend [the] complaint or particularize [the] allegations.") (citing *Coleman*). Particularly in cases such as this one, where constitutional rights are at stake, the policy favoring adjudication on the merits rather than on the technicalities of pleading requirements is salient. Further, the determination of a dismissal with or without prejudice is within the discretion of the district court, and without the issue of an amended complaint being fully considered, I am not yet willing to dismiss this case with prejudice.  Accordingly, I will permit the Plaintiffs to file a motion for leave to file an amended complaint if they wish, by August 27, 2021.  The motion shall specifically address the issue of whether allowing an amended complaint at this juncture should be denied as futile.  Moreover, the motion shall not reargue the legal matters that I have already ruled on with respect to the current complaint.  Defendants may respond to the motion by

September 17, 2021, and the Plaintiffs may file a reply by October 1, 2021.  Unless otherwise ordered by the Court, the memorandum in support of the motion to file an amended complaint and the opposition memorandum shall not exceed 20 pages, exclusive of any tables of contents and authorities, and the Plaintiffs' reply shall not exceed 15 pages.  Further, any motion to amend the complaint shall include, as an exhibit to the motion, a redline version of the proposed amended complaint.  Loc. R. 103.6(c) (D. Md. 2021).  If the motion is denied, the case will be dismissed with prejudice.  If the motion is granted, the amended complaint will be accepted, and Defendants shall respond accordingly.

## Conclusion

For the foregoing reasons, the Defendants' motion to dismiss, ECF No. 12, is GRANTED; the Plaintiffs are directed, if they wish, to file a motion for leave to amend, after which I will decide whether amendment would be futile.  A separate order shall issue.

DATED this 6th day of August, 2021.

BY THE COURT:

_____/s/_____
Paul W. Grimm
United States District Judge