IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| **IRENE MOSS THOMPSON, as** | \* |
| **Administrator of the ESTATE OF** | |
| **ROBERT LAWRENCE WHITE, II,** *et al.*, | \* |
| Plaintiffs, | \* |
| v. | \*  Civ. No. DLB-20-1272 |
| **ANAND M. BADGUJAR,** *et al.*, | \* |
| Defendants. | \* |

### MEMORANDUM OPINION

On the afternoon of June 11, 2018, Robert White, a Black man, was killed by Anand Badgujar, a Montgomery County Police Department ("MCPD") officer, in Silver Spring, Maryland after White, who was walking down the street by himself, refused to respond to Badgujar's demands that he stop. White's sister, Irene Moss Thompson, administrator of White's estate, and his brother, Roddy Moss Thompson, claim that Badgujar targeted White because he was Black. In their amended complaint, the plaintiffs assert Equal Protection Clause claims and parallel state constitutional claims against Badgujar and Montgomery County ("the County"), a failure to train and supervise claim against the County, and survival and wrongful death claims against both defendants. ECF 34. The defendants have moved to dismiss the amended complaint for failure to state a claim. ECF 40, 40-1. The motion is fully briefed. ECF 42 & 43. No hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2023). For the following reasons, the defendants' motion to dismiss is granted.

**I.  Background**

The Court accepts as true the following allegations in the amended complaint. Around 2 p.m. on June 11, 2018, Robert White, a Black man with mental disabilities, including cognitive

impairments, was walking down the street in Silver Spring, Maryland. ECF 34, ¶¶ 1, 9. Badgujar was driving his police vehicle when he saw White, alone, walking at a "natural pace." *Id.* ¶ 10. Badgujar saw no weapons on White nor injuries to White or anyone else. White was not the subject of a citizen complaint nor was Badgujar responding to a complaint. *Id.* ¶¶ 9–10. Badgujar claimed he could see that White's hands were in his pockets, that White looked at him, and that White wore a torn hoodie. *Id.* ¶ 11. While still in the police car, Badgujar called out to White, but White declined to respond and continued walking at the same pace. *Id.*

Badgujar then stopped the car, got out, drew his firearm, and began to pursue White, at gunpoint, on foot. *Id.* ¶ 12. "At no point prior or during the pursuit did Officer Badgujar articulate, describe, or imply any nature of criminal activity or suspicious behavior." *Id.* Badgujar approached White "within inches" and "touched and assaulted" White with a taser. *Id.* ¶ 13.

The plaintiffs allege that Badgujar "without legal basis, without reasonable articulable suspicion of criminal activity, pursued, harassed, pointed a firearm, provoked, assaulted via taser, shot, and killed" White. *Id.* ¶ 7. They claim that Badgujar's decision to initiate pursuit and provoke White was based on White's race. *Id.* ¶ 35. As evidence of this race-based decision, the plaintiffs allege that when Badgujar was employed by the Baltimore City Police Department ("BPD"), he "effected or was involved in eighty (80) arrests and criminal charges" in Maryland district court between December 2011 and August 2015 and of those 80 arrestees, 70, or 88%, were Black and eight were "white or other." *Id.* ¶¶ 18–19. These statistics are significant, according to the plaintiffs, because during 2015, Black people comprised only 63% of the Baltimore population. *Id.* ¶ 17. Also during the time Badgujar worked for BPD, the Department of Justice investigated BPD and concluded in 2016 that BPD "used enforcement strategies that produced 'severe and unjustified disparities in the rates of . . . arrests of African Americans.'" *Id.*

¶ 17 (quoting *Investigation of the Baltimore City Police Department*, U.S. Dep't of Just. Civ. Rts. Div. 3 (Aug. 10, 2016), https://www.justice.gov/d9/bpd_findings_8-10-16.pdf).

As for the MCPD, the plaintiffs allege it too "engages in such unconstitutional conduct and has a pattern and practice of targeting African Americans for disparate treatment based on their race," including "disproportionately stopping and arresting African Americans." *Id.* ¶¶ 20–24. "MCPD . . . stops African American motorists for arbitrary reasons at a rate of approximately 75% more than MCPD stops Caucasian motorists; and searches vehicles of African American motorists at more than twice the rate of Caucasian motorists." *Id.* ¶ 20 (citing allegations in the complaint filed in *Faulk-Foster v. Dyer*, PX-19-1265 (D. Md.)).  While Black residents constitute approximately 20% of the County's population, "for calendar years 2018 and 2019, over 50% of MCPD's criminal district court-level cases were against African Americans (51.8% for 2018, and 53.8% for 2019)." *Id.* ¶¶ 23–24.

In addition to statistics, the plaintiffs cite a prior interaction White had with MCPD in Silver Spring.  In December 2016, an MCPD officer saw White from about 20 feet away; White was standing on the sidewalk waiting for a walk signal and showed no signs of sweat, being out of breath, or flight.  *Id.* ¶ 26.  The officer demanded that White speak with him, but White refused and asked that he not be followed.  *Id.*  Despite White's request, "the officer stopped, deprived [White] of his liberty, and seized [him] on grounds of searching for a 5-foot 7-inches man wearing blue jeans and who was Hispanic."  *Id.*  White, however, was "6 feet 1 inches tall, wearing gray sweatpants, and obviously African American."  *Id.*  The 2016 and the 2018 incidents are "astonishingly similar" except that the second incident "led to Mr. White's death."  *Id.* ¶ 27.

The plaintiffs bring seven counts against the defendants:  42 U.S.C. § 1983 claims against Badgujar and the County for violations of the Fourteenth Amendment's Equal Protection Clause

(Counts I & II); unlawful treatment and violation of due process under Article 24 of the Maryland Declaration of Rights (Count III); a § 1983 claim against Montgomery County for failure to train and supervise (Count IV); municipal liability based on *respondeat superior* (Count V); a survival action (Count VI); and wrongful death (Count VII). *Id.* ¶¶ 33–63.[1]

## II.   Standard of Review

The defendants move to dismiss the amended complaint for failure to state a claim. Under Rule 12(b)(6), a party may seek dismissal for failure "to state a claim upon which relief can be granted." *Robertson v. Anderson Mill Elementary Sch.*, 989 F.3d 282, 290 (4th Cir. 2021) (quoting Fed. R. Civ. P. 12(b)(6)). To survive the challenge, the opposing party must have pleaded facts demonstrating it has a plausible right to relief from the Court. *Lokhova v. Halper*, 995 F.3d 134, 141 (4th Cir. 2021) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). A plausible claim is more than merely conceivable or speculative. *See Holloway v. Maryland*, 32 F.4th 293, 299 (4th Cir. 2022). The allegations must show there is "more than a sheer possibility that the defendant has acted unlawfully." *Int'l Refugee Assistance Project v. Trump*, 961 F.3d 635, 648 (4th Cir. 2020) (quoting *Iqbal*, 556 U.S. at 678). But the claim does not need to be probable, and the pleader need

---

[1] The amended complaint was filed after the Court dismissed the claims asserted in the initial complaint. The Court found the plaintiffs had failed to state Fourth Amendment claims for unreasonable deprivation of liberty and excessive force, claims under Title II of the Americans with Disabilities Act and the Rehabilitation Act, a *respondeat superior* claim, and survival action and wrongful death claims. *See* ECF 19 & 20. The Court determined that White was not seized for purposes of the Fourth Amendment until Badgujar shot him, a finding that made his unreasonable deprivation of liberty and excessive force claims fail. ECF 19, at 10. As to the shooting itself, the Court found that Badgujar's actions were reasonable given the circumstances, which meant no Fourth Amendment violation occurred. *Id.* at 14. The plaintiffs moved for reconsideration or alternatively for leave to amend, and they filed a proposed amended complaint. ECF 24, 24-1. The Court denied the plaintiffs' motion for reconsideration and found that the proposed amended complaint was deficient but granted leave to amend. ECF 33. The plaintiffs filed an amended complaint on October 14, 2022. ECF 34. Although the operative complaint is titled the "Second Amended Complaint," the Court simply refers to the operative pleading as the amended complaint.

not show "that alternative explanations are less likely" than their theory. *Jesus Christ is the Answer Ministries, Inc. v. Balt. Cnty., Md.*, 915 F.3d 256, 263 (4th Cir. 2019) (quoting *Houck v. Substitute Tr. Servs., Inc.*, 791 F.3d 473, 484 (4th Cir. 2015)).  The Court must accept the allegations as true and draw all reasonable inferences in favor of the pleader. *Williams v. Kincaid*, 45 F.4th 759, 765, 777 (4th Cir. 2022).  The Court does not accept "legal conclusions couched as facts or unwarranted inferences, unreasonable conclusions, or arguments." *United States ex rel. Taylor v. Boyko*, 39 F.4th 177, 189 (4th Cir. 2022) (quoting *United States ex rel. Nathan v. Takeda Pharms. N. Am., Inc.*, 707 F.3d 451, 455 (4th Cir. 2013)).

### III. Discussion

#### A. Selective Enforcement Claim

The plaintiffs seek damages under 42 U.S.C. § 1983 for Badgujar's and the County's violations of White's equal protection rights.  Section 1983 imposes liability on anyone who, under the color of state law, deprives a person "of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983.  Section 1983 is not itself a "source of substantive rights" and is merely "a method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution and federal statutes that it describes." *Lambert v. Williams*, 223 F.3d 257, 260 (4th Cir. 2000) (citations omitted).  To state a cause of action under § 1983, a plaintiff must allege a deprivation of rights guaranteed by the Constitution or laws of the United States and that the deprivation resulted from conduct committed by a person acting under the color of state law. *Campbell v. Florian*, 972 F.3d 385, 392 n.5 (4th Cir.), *as amended* (Aug. 28, 2020) (citing *West v. Atkins*, 487 U.S. 42, 48 (1988)).

The plaintiffs claim Badgujar violated White's rights under the Equal Protection Clause by choosing to pursue and provoke White because of White's race.  Under the Equal Protection

Clause, "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. This constitutional protection prohibits race-driven decisions to prosecute violations of the law. *United States v. Armstrong*, 517 U.S. 456, 465 (1996) (stating a selective prosecution claim arises when a "prosecutor has brought the charge for reasons forbidden by the [Equal Protection Clause of the] Constitution"). "In order to dispel the presumption that a prosecutor has not violated equal protection, a criminal defendant must present clear evidence to the contrary" by demonstrating that the prosecutorial decision "had a discriminatory effect and . . . was motivated by a discriminatory purpose." *Id*. Therefore, the defendant must establish "(1) that similarly situated individuals of a different race were not prosecuted, and (2) that the decision to prosecute was invidious or in bad faith." *United States v. Olvis*, 97 F.3d 739, 743 (4th Cir. 1996). The standard for proving selective prosecution claims against prosecutors also applies to selective enforcement claims against police officers when a plaintiff alleges an officer made an enforcement decision on the basis of race. *Johnson v. Holmes*, 782 F. App'x 269, 276–77 (4th Cir. 2019) (holding Equal Protection Clause prohibits police officers "from selectively enforcing laws based on race") (citing *Whren v. United States*, 517 U.S. 806, 813 (1996)); *Brent v. City of Cumberland Police Dep't*, No. JKB-22-1349, 2023 WL 2457591, at *7 (D. Md. Mar. 10, 2023) (quoting *Johnson*, 782 F. App'x at 276–77).

Outside of the criminal prosecution context, a plaintiff may assert a selective enforcement claim under 42 U.S.C. § 1983. *Johnson*, 782 F. App'x at 270–71, 275 (explaining the plaintiffs brought § 1983 "Fourteenth Amendment equal protection case[s]" against Albemarle County police officers); *see also, e.g.*, *Dique v. N.J. State Police*, 603 F.3d 181, 185–88 (3d Cir. 2010) (recognizing a § 1983 claim for selective enforcement against New Jersey state troopers for stopping plaintiff on the basis of his race). A plaintiff in a civil suit alleging an Equal Protection

6

Clause violation based on selective enforcement must satisfy the same standard for selective prosecution claims in criminal cases. *See Johnson*, 782 F. App'x at 277 (requiring plaintiffs to prove officer's "conduct (1) was motivated by a discriminatory intent; and (2) had a discriminatory effect"); *Cent. Radio Co. v. City of Norfolk, Va.*, 811 F.3d 625, 634–35 (4th Cir. 2016) (requiring plaintiff suing the City of Norfolk to "demonstrate that the government's enforcement process 'had a discriminatory effect and that it was motivated by a discriminatory purpose'") (quoting *Wayte v. United States*, 470 U.S. 598, 608 (1985)).[2]

*Discriminatory Effect*

"To establish a discriminatory effect in a race case, the claimant must show that similarly situated individuals of a different race were not prosecuted." *Armstrong*, 517 U.S. at 465. To determine "whether persons are similarly situated for equal protection purposes, a court must examine all relevant factors." *Olvis*, 97 F.3d at 744. Individuals "are similarly situated when their

---

[2] Before evaluating the allegations of discriminatory effect and intent, the Court addresses the defendants' argument that the challenged police action—Badgujar's decision to pursue and provoke White—is "short of a seizure," and police actions that do not amount to seizures cannot form the basis of an equal protection violation. ECF 40-2, at 12–13. For support, the defendants cite to *Santos v. Frederick County Board of Commissioners*, 884 F. Supp. 2d 420 (D. Md. 2012). The *Santos* Court suggested that such actions could not support an equal protection claim, 884 F. Supp. 2d at 429–31, but as the Fourth Circuit noted in 2013, and as remains the case ten years later, the Fourth Circuit has not yet addressed the issue, *see Santos v. Frederick Cnty. Bd. of Comm'rs*, 725 F.3d 451, 459 n.2 (4th Cir. 2013) (noting that issue of whether police action short of a seizure can give rise to an equal protection claim was not presented on appeal and the Fourth Circuit "has not yet addressed the issue"). To be sure, some other courts have held police encounters short of seizures may give rise to an equal protection claim. *See Martin v. Conner*, 882 F. Supp. 2d 820, 839 (D. Md. 2012) (noting "encounters with officers may violate the Equal Protection Clause when initiated . . . based on racial considerations" (quoting *United States v. Frazier*, 394 F.3d 612, 617 (8th Cir. 2005)); *United States v. Avery*, 137 F.3d 343, 353 (6th Cir. 1997) (holding "consensual encounters may violate the Equal Protection Clause when initiated solely based on racial considerations"); *United States v. Manuel*, 992 F.2d 272, 275 (10th Cir. 1993) (holding "selecting persons for consensual interviews based solely on race is deserving of strict scrutiny and raises serious equal protection concerns"). Because the Court ultimately finds the plaintiffs have failed to plausibly allege the discriminatory effect or intent necessary to state an equal protection claim, the Court need not reach this issue.

circumstances present no distinguishable legitimate . . . factors that might justify making different . . . decisions with respect to them." *United States v. Venable*, 666 F.3d 893, 900–01 (4th Cir.), *as amended* (Feb. 15, 2012). A plaintiff may cite statistical studies to demonstrate discriminatory effect, but the studies must have an "an appropriate basis for comparison" and "raw data about the percentage of black . . . defendants proves nothing." *Olvis*, 97 F.3d at 745. Without an appropriate basis for comparison, statistical evidence of racial disparity alone cannot establish discriminatory effect or intent. *Id.*

The Fourth Circuit has explained what evidence is sufficient to show discriminatory effect on at least three occasions. In *Olvis*, two Black defendants charged in a crack-cocaine conspiracy in Williamsburg, Virginia moved to dismiss the indictment because the prosecutor allegedly chose to prosecute them based on their race. To prove their claim, they sought discovery on "the government's criteria for prosecution." *Id.* at 741. To obtain discovery, the defendants had to produce "'some evidence' making a 'credible showing' of both discriminatory effect and discriminatory intent." *Id.* at 743 (quoting *Armstrong*, 517 U.S. at 468–70). That requirement was a "rigorous one" and constituted a "significant barrier" to granting the defendants' motion. *Id.* In support of their discovery request, the defendants cited evidence that "more than 90% of those indicted in the Norfolk–Newport News area since 1992 for crack cocaine trafficking are black." *Id.* at 745. In addition, they identified anecdotal evidence of five white people who were not prosecuted. *Id.* at 744–45. The Fourth Circuit held that the defendants had not met their burden to obtain discovery because they did not identify similarly situated white people who were not prosecuted. *Id.* The white comparators, the court held, were not similarly situated for a variety of reasons including their willingness to cooperate with the government, the nature of the evidence against them, and the seriousness of the defendants' crimes. *Id.* The statistics offered by the

defendants also were insufficient to make a credible showing of discriminatory effect because they did not include "statistical evidence on the number of blacks who were actually committing crack cocaine offenses or whether a greater percentage of whites could have been prosecuted for such crimes." *Id.* at 745. Without "an appropriate basis for comparison" with similarly situated white people, the "raw data about the percentage of black . . . defendants prove[d] nothing." *Id.*

In *United States v. Venable*, James Venable moved to dismiss a felon-in-possession of a firearm charge, arguing he was selected for prosecution because he was Black. 666 F.3d at 895. In support of his request for discovery of the criteria and procedures the government used to decide to prosecute him, he cited the fact that two white people could have been charged with the same crime but were not, and he identified statistics that the vast majority of those charged with firearms offenses in the Richmond division of the United States Attorney's office were Black. *Id.* at 895, 898. As in *Olvis*, the court found this information insufficient to allege a credible showing of discriminatory effect. The two white people Venable identified were not similarly situated to him because "Venable was originally charged by the Richmond Commonwealth Attorney's Office, geographically located in the Eastern District of Virginia, and was prosecuted federally only because the Richmond Commonwealth Attorney's Office presented his case to the United States Attorney's Office," while the two white people "were prosecuted by Campbell County authorities—geographically located in the Western District of Virginia." *Id.* at 901–02. The court stated it was "largely dispositive here that different prosecutors in different jurisdictions under differing sovereigns made the different prosecutorial decisions as to [the white people] on the one hand, and Venable on the other." *Id.* at 901. Accordingly, the court found Venable had "failed to produce any evidence making a credible showing that he was similarly situated to the white

defendants . . . who were not prosecuted federally."[3]  *Id.* at 900–03.  Also, Venable's statistics, like the statistics offered by the *Olvis* defendants, "contain[ed] no appropriate basis for comparison."  *Id.* at 903.  They "provide[d] no statistical evidence about the number of blacks who were actually committing firearms offenses or whether a greater percentage of whites could have been prosecuted for such crimes."  *Id.*

Finally, in *United States v. Hare*, the defendants—three Black men charged with drug, robbery, and firearm offenses after being targeted by the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") as part of a sting operation—moved to dismiss the indictment because ATF allegedly targeted them based on their race, and they moved for discovery "into whether race played a role in ATF's decision to target [them] for a stash house sting operation."  820 F.3d 93, 95, 97 (4th Cir. 2016).  In support of their discovery motion, the defendants pointed to the fact that "all 32 defendants prosecuted in [ATF] stash house sting cases in the District of Maryland [had]

---

[3] The court analyzed the factors detailed by *Olvis*—of which there are nine in total—to ascertain whether the two white people were similarly situated to Venable.  *See Venable*, 666 F.3d at 900–01.  Those factors are:

> (1) a prosecutor's decision to offer immunity to an equally culpable defendant because that defendant may choose to cooperate and expose more criminal activity; (2) the strength of the evidence against a particular defendant; (3) the defendant's role in the crime; (4) whether the defendant is being prosecuted by state authorities; (5) the defendant's candor and willingness to plead guilty; (6) the amount of resources required to convict a defendant; (7) the extent of prosecutorial resources; (8) the potential impact of a prosecution on related investigations and prosecutions; and (9) prosecutorial priorities for addressing specific types of illegal conduct.

*Id.* at 901.  The issue of the differing jurisdictions was "a permutation of the fourth *Olvis* factor: whether the defendant is being prosecuted by state authorities."  *Id.*  Although some factors, including the second and third, weighed in favor of finding Venable similarly situated to at least one of the white individuals, the court ultimately determined Venable could not overcome the outcome-determinative fact that different jurisdictions were at issue.  *Id.* at 901–03.  Because the plaintiffs here identify no one who is potentially similarly situated, the Court need not address these factors.

been black." *Id.* at 99. This statistic was insufficient to demonstrate discriminatory effect because it "provides no appropriate basis for comparison, as it contains no data on similarly situated white individuals who could have been targeted for stash house sting investigations but were not." *Id.* at 99–100. And while the defendants also identified a "white crew" involved in robberies and drug distribution in Maryland, they did not establish that "the crew members' criminal histories indicated that they would be receptive to a stash house robbery scenario, or whether ATF had the means of infiltrating this crew undercover." *Id.* The court therefore could not determine whether the two groups were similarly situated. *Id.*

Applying these holdings to the facts of this case, the Court finds that the plaintiffs have not sufficiently alleged that Badgujar's decision to pursue and provoke White had a discriminatory effect. The plaintiffs rely almost exclusively on statistics. They point to Badgujar's arrest record as a BPD officer between December 2011 and August 2015, which reflects he arrested and charged in Maryland district court 80 people, of whom 70 (or 88%) were Black and only 8 were "white or other," while the City of Baltimore's Black population was approximately 63%. ECF 34, ¶¶ 18–19. They also cite to MCPD stop, arrest, and charging statistics. The statistics reflect that MCPD stops Black motorists at a higher rate than white motorists and that in 2018 and 2019, "over 50% of MCPD's criminal district court-level cases were against African Americans," despite Black residents making up just 20% of the County's population. *Id.* ¶¶ 20–24. These statistics fall short of plausibly alleging discriminatory effect. For one, they focus primarily on the percentages of Black motorists stopped and Black people arrested and charged with crimes and compare those percentages with the percentage of Black people in the jurisdiction. As we know from *Olvis*, "raw data about the percentage of black . . . defendants proves nothing." 97 F.3d at 745. The statistics suffer another problem: They do not identify why the people were stopped, arrested, and charged,

leaving unanswered whether any of them were pursued and provoked by police in similar circumstances. The plaintiffs also do not cite any statistical evidence of how frequently police chose not to pursue and provoke white people under circumstances similar to White's. Citing no comparators at all, the plaintiffs cannot allege discriminatory effect by merely citing to statistics about the number of Black people stopped, charged, and arrested. *Id.*

The anecdotal allegation that, two years before he was shot and killed by Badgujar, a different MCPD officer stopped and approached White in Silver Spring while White was walking down the street unsuspiciously does not support an inference of discriminatory effect. The strikingly similar police encounter offers no basis to infer that similarly situated white people could have been approached by police but were not. *See id.*

To be sure, the plaintiffs are at a disadvantage because there are "less likely to be records of similarly situated individuals who were never" approached. *See Hare*, 820 F.3d at 100. It is difficult to conduct statistical analyses or find anecdotal accounts on decisions *not* to approach. *See id*. Still, to support allegations of discriminatory effect, the law requires a plausible allegation that similarly situated people were not subject to the enforcement action. On that score, the plaintiffs' statistics fall short.

*Discriminatory Intent*

Even if the plaintiffs had alleged discriminatory effect, they have not plausibly alleged discriminatory intent. Demonstrating discriminatory intent requires a plaintiff to establish "unequal treatment was the result of intentional or purposeful discrimination." *Morrison v. Garraghty*, 239 F.3d 648, 654 (4th Cir. 2001). This standard requires a showing the officer's actions were "invidious or in bad faith." *Hare*, 820 F.3d at 100. The plaintiff must show the officer "selected or reaffirmed a particular course of action at least in part because of, not merely

in spite of, its adverse effects upon an identifiable group." *Venable*, 666 F.3d at 903 (quotation marks omitted).  It suffices for a plaintiff to demonstrate that the discriminatory purpose was a "motivating factor" in the decision.  *Coal. for TJ v. Fairfax Cnty. Sch. Bd.*, 68 F.4th 864, 883 (4th Cir. 2023).  Determining an officer's intent involves a "sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977).  When, as here, the case involves "discretionary judgments 'essential to the criminal justice process,' statistical evidence of racial disparity is insufficient to infer" discriminatory intent.  *Olvis*, 97 F.3d at 746 (quoting *McCleskey v. Kemp*, 481 U.S. 279, 297 (1987)); *Hare*, 820 F.3d at 100 (holding statistical evidence with a "relatively small sample size and weak basis for comparison, is clearly insufficient" to show discriminatory intent).

Even if the plaintiffs' statistics adequately alleged discriminatory effect—and they do not—they are certainly not enough to allege discriminatory intent.  The statistics suffer from the same defects found "clearly insufficient" in *Hare*—a "relatively small sample size" and no "basis for comparison." *Hare*, 820 F.3d at 100.  Beyond statistics, the plaintiffs do not allege any direct or circumstantial evidence of discriminatory intent, such as a statement by Badgujar suggesting he was hostile towards Black people because of their race.  *See, e.g.*, *Chavez v. Ill. State Police*, 251 F.3d 612, 646 (7th Cir. 2001) (noting an officer's statement referring to "you people" was evidence of racial animus).  Badgujar's conduct—calling out to White, demanding he respond, approaching him, tasing him, and ultimately killing him—does not suggest the officer chose to pursue and provoke White because he was Black.[4]  The plaintiffs do not allege any statements or affirmative acts by Badgujar that support the inference that he was motivated by racial animus.  Without them,

---

[4] White's similar experience with a different MCPD officer two years earlier is not probative of Badgujar's intent during his interaction with White.

13

the plaintiffs do not plausibly allege discriminatory intent. *See Vill. of Arlington Heights*, 429 U.S. at 266–71 (holding a record that reflected no statements or evidence of animus could not demonstrate discriminatory intent despite existence of a policy's disproportionate impact on minorities). And the Court cannot plausibly infer racial animus from the fact that White is Black and Badgujar did not have an obvious reason for approaching him. *Ogunsula v. Md. State Police*, No. ELH-20-2568, 2021 WL 6105503, at *31 (D. Md. Dec. 23, 2021) (dismissing selective enforcement claim where the plaintiff's "claim boils down to allegations that plaintiff is Black, [defendant] is white, [and defendant] observed [plaintiff's] race before initiating the traffic stop").

The inadequate allegations in this case contrast markedly with the allegations in other cases where a selective enforcement claim survived a motion to dismiss. For example, in *Lacey v. Maricopa County*, the owners of a newspaper, the Phoenix New Times, were arrested for publishing Sheriff Joe Arpaio's address online in violation of an Arizona privacy statute. 693 F.3d 896, 907, 911 (9th Cir. 2012). In a § 1983 action, they asserted an equal protection violation on the grounds that they were selected for prosecution because they wrote and published articles criticizing Arpaio—an exercise of their First Amendment rights. *Id.* at 920–21. To allege discriminatory effect, they identified at least three identically situated online publications who also made Arpaio's address available online but whose owners were not investigated, arrested, or prosecuted. *Id.* To allege intent, the plaintiffs pointed to statements by a member of Arpaio's staff, made before the charges were filed, urging the prosecution of the New Times but absolving the other publications because they had not "resorted to writing articles against the Sheriff." *Id.* at 921–22. The court held the totality of the allegations stated a selective enforcement claim. *Id.*

In *Johnson v. Holmes*, the plaintiffs, a Black couple who resided in Albemarle County, Virginia, were driving their car when they were stopped by an officer who issued a citation for

14

driving on a suspended license. 204 F. Supp. 3d 880, 883 (W.D. Va. 2016). The officer later obtained a warrant to search their home for materials relating to the suspended license. *Id.* at 883–84. In support of their selective prosecution claim, the plaintiffs alleged that the officer had a "history and practice of targeting African American males for vehicle stops and intrusive searches" and identified "numerous, similar complaints of unlawful treatment [that] had been lodged by other African American citizens of Albemarle County" against the officer. *Id.* at 890–91. Based on these allegations, the court found the plaintiffs stated a "plausible selective enforcement claim under the Equal Protection Clause." *Id.* The plaintiffs here do not cite allegations remotely similar to those in *Lacey* or *Johnson*.

For these reasons, the Court finds that the plaintiffs have not plausibly alleged Badgujar violated White's rights under the Equal Protection Clause. The selective enforcement claim is dismissed.[5]

### B. Remaining Claims

Because the plaintiffs have not adequately alleged that Badgujar committed an equal protection violation, the rest of their claims also fail.

The plaintiffs' § 1983 claims against the County—an equal protection claim (Count II) and a failure-to-train and supervise claim (Count IV)—cannot survive because the underlying constitutional violation against Badgujar, the County's employee, did not survive. Under *Monell*

---

[5] The plaintiffs argue that it is premature to rule on the motion to dismiss because they need discovery to allege a selective enforcement claim. The Court disagrees. For the same reasons they have failed to state a claim, they do not meet the standard for obtaining discovery set forth in *Armstrong* and applied in *Olvis*, *Venable*, and *Hare*. *See Armstrong*, 517 U.S. at 464 (holding motions for discovery in selective prosecution cases must meet a "rigorous standard"); *see also United States v. Raynor*, No. DJN-13-MJ-215, 2013 WL 5770529, at *7 (E.D. Va. Oct. 24, 2013) (denying motion for discovery on selective prosecution claim because of the "[d]efendants' inability to cite to a single similarly situated white person who was not prosecuted").

*v. Department of Social Services of City of New York*, 436 U.S. 658 (1978), municipalities may be liable if their policies cause constitutional violations and, with respect to failure-to-train and supervise claims, are liable if that failure stems from a deliberate or conscious choice by the municipality. *Washington v. Balt. Police Dep't*, 457 F. Supp. 3d 520, 533 (D. Md. 2020) (citing *City of Canton v. Harris*, 489 U.S. 378, 389 (1989)). These counts, therefore, rise and fall together because both are predicated on a viable constitutional claim against Badgujar. The § 1983 claim against him "is the gateway to all other § 1983 claims, for supervisors and municipalities cannot be liable under § 1983 without some predicate 'constitutional injury at the hands of the individual [state] officer,' at least in suits for damages." *Waybright v. Frederick Cnty., Md.*, 528 F.3d 199, 203 (4th Cir. 2008) (quoting *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986)); *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 173 (4th Cir. 2016) (holding a determination that a defendant did not violate the plaintiff's "constitutional rights also forecloses [plaintiff's] claims against [the Municipality, defendant's] employer"); *City of Canton*, 489 U.S. at 389, 392 (holding municipal liability for failure to train does not lie unless there is an underlying "constitutional deprivation"). Without a constitutional violation by Badgujar, the *Monell* claims against the County are dismissed.

Count III is a claim against Badgujar under Article 24 of the Maryland Declaration of Rights for depriving White of "liberty and privileges, without reason to believe that [he] had violated any law." ECF 34, ¶¶ 42–46. "Article 24 of the Maryland Declaration of Rights and the Fourteenth Amendment of the United States Constitution have the same meaning, and . . . Supreme Court interpretations of the Fourteenth Amendment function as authority for interpretation of Article 24." *Pitsenberger v. Pitsenberger*, 410 A.2d 1052, 1056 (Md. 1980); *Murphy v. Edmonds*, 601 A.2d 102, 107 (Md. 1992) (observing "it is settled that the Due Process Clause of the Maryland

16

Constitution, contained in Article 24 of the Declaration of Rights, embodies the concept of equal protection of the laws to the same extent as the Equal Protection Clause of the Fourteenth Amendment"). Because the analysis under Article 24 is the same as the equal protection analysis, the Court dismisses Count III for the same reasons Count I was dismissed. *Washington v. State*, 148 A.3d 341, 354 (Md. 2016) (noting Article 24 has been interpreted to apply "in like manner and to the same extent as the Fourteenth Amendment of the Federal Constitution") (quoting *Att'y Gen. of Md. v. Waldron*, 426 A.2d 929, 941 (Md. 1981)).

Counts VI and VII, the survival action and wrongful death claims against Badgujar and the County, also must be dismissed. These claims "grow out of the same wrongful conduct" but are ultimately distinct with respect to the recovery they provide. *Smith v. Borello*, 804 A.2d 1151, 1155 (Md. 2002); Md. Code Ann., Est. & Trusts § 7-401(y)(1) (survival action statute); Md. Code Ann., Cts. & Jud. Proc. § 3-904 (wrongful death statute). The survival action statute allows a representative to prosecute any "claim" the decedent could have brought, § 7-401(y)(1), and the wrongful death statute allows recovery for any "wrongful act" for which the decedent could have recovered had they lived, § 3-904. Both claims are predicated upon finding that the decedent's death was caused by a wrongful act. *Smith*, 804 A.2d at 1155; *see also Tchakounte v. Uber Techs., Inc.*, No. CCB-20-3028, 2022 WL 326727, at *2 (D. Md. Feb. 3, 2022) (noting, under both causes of action, a plaintiff must allege a duty, breach, causation, and proximate cause). Here, the only alleged "wrongful act" is Badgujar's alleged violation of White's equal protection rights. Because the plaintiffs have failed to plausibly allege an equal protection violation, they cannot state a survival action or wrongful death claim.

Without a viable survival action or wrongful death claim, the plaintiffs' *respondeat superior* claim against the County (Count V) also must be dismissed.

## IV. Conclusion

The defendants' motion to dismiss, ECF 40, is granted. The amended complaint, ECF 34, is dismissed with prejudice because this was the plaintiffs' "final opportunity to correct the deficiencies." *See* ECF 33, at 11. A separate order follows.

September 29, 2023  
Date

_____  
Deborah L. Boardman  
United States District Judge